UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LAMONT JOHNSON,

        Petitioner,    **MEMORANDUM & ORDER**

    - against -    No. 09-CV-3038 (ERK)

HANS WALKER, Superintendent of
Auburn Correctional Facility

        Respondent.
------------------------------------------------------------------------X

KORMAN, J.:

  In 2001, petitioner Lamont Johnson, also known as Your Majesty, filed a petition seeking *habeas corpus* relief pursuant to 28 U.S.C. § 2254 from his 1987 New York State conviction on two counts of second-degree murder. In 2003, I rejected all of the grounds for relief except one, which related to the introduction of allegedly perjured testimony at Johnson's trial. *Johnson v. Walker* ("*Johnson I*"), No. 01-cv-6862, 2003 WL 22002420, at *9 (E.D.N.Y. Aug. 27, 2003). On that claim, I remanded the case to the New York State Supreme Court for findings of fact. On remand, the Supreme Court Justice to whom the case was assigned, Yvonne Lewis, conducted several days of hearings and ultimately found that Johnson had not established that any perjured testimony was utilized in the course of his trial. Subsequently, Johnson filed an amended habeas petition that reinstated the remanded claim and added a new *Brady* claim involving a ballistics report that was not provided to Johnson at his trial. The amended petition was filed under the current docket number, 09-cv-3038, which was consolidated with the initial petition.

1

## BACKGROUND

**I.    Evidence at Trial**

The events underlying Johnson's conviction occurred more than two decades ago on June 24, 1986.  At approximately 3:30 am, Johnson and an unapprehended accomplice shot and killed Lance Gonzalez on Myrtle Avenue in Brooklyn, then chased down and shot Damon Rogers on Vernon Avenue, after Rogers pleaded for his life.  Police found the bodies of Gonzalez and Rogers lying in the street within approximately five minutes after the shooting.  (Trial Tr. 31-32.) Two individuals who witnessed the shooting, Marvin Lamar and Selvin Spencer, testified at trial. Lamar testified that he had engaged in a fight with Johnson earlier that summer.  (*Id.* at 51-52.) Moreover, he testified that on the night of the shooting, he had looked through his apartment window and witnessed an individual that "looked like" Johnson or was an "exact look-a-like with" Johnson commit the shooting on Vernon Avenue.  (*Id.* at 55, 57-62.)  In the grand jury, however, Lamar had testified that the individual he witnessed commit the shooting was indeed Johnson.  (*Id.* at 58.)  Lamar had also been shown a photographic array by police officers, and had identified Johnson as the shooter.  This fact, however, was not elicited at trial because such evidence is not admissible under New York law.  *People v. Cioffi*, 1 N.Y.2d 70, 73 (1956).

The other witness, Selvin Spencer, was on the street at the time of the murders and identified Johnson at trial.  (Trial Tr. 334.)  Like Lamar, Spencer had also selected Johnson's photograph from the photographic array.  At trial, Spencer was initially reluctant to testify because he and his family were "getting threats."  (*Id.* at 125-26.)  When he was called, Spencer refused to testify and also refused to give a reason for his reluctance.  Outside of the presence of the jury, the judge threatened to hold Spencer in contempt "a hundred times," and told Spencer that he could impose a consecutive thirty-day sentence for each instance of contempt.  (*Id.* at

2

266.) In response, Spencer stated that his family had received threats. (*Id.* at 268.) During a hearing that was held to determine the nature and source of the threats, Spencer's father testified that he had a received a call from Spencer's ex-wife. According to Spencer's father, the ex-wife stated that "I got a call from a man saying that if your son testifies he was going to bring harm to me and the two kids and your family." (*Id.* at 311.) Subsequently, a detective who was in the holding pens with Spencer testified that she overheard a conversation between Spencer and another individual who the detective believed was Johnson. According to the detective, the individual said, "That guy in there, Rahim [Spencer's street name], you better do the right thing." Spencer responded, "Don't worry about it, Lamont, I'm not with them. I'm not going to testify." (*Id.* at 318-19.)

After the detective testified, the prosecutor received a communication from Spencer that he was willing to take the stand. In the presence of the jury, Spencer stated that on the night of the shootings, Spencer was walking on Sumner Street when he observed a burgundy car with a livery license plate slowly driving around the block. (*Id.* at 370.) Spencer then observed two men exit the vehicle, who then argued with Johnson and another individual. Spencer then heard a number of gunshots and saw Johnson and another individual chase one of the victims around the corner, where he heard the victim pleading, "Please don't kill me." (*Id.* at 333.) Spencer then heard "ten or fifteen shots." (*Id.* at 336.)

Johnson was found guilty of two counts of second-degree murder and was sentenced to two consecutive terms of twenty years to life.

## II. Federal Habeas and Proceedings on Remand

After repeated efforts to collaterally attack his conviction in state court, Johnson filed his federal habeas petition in 2001. After all but one claims were found to be without merit, the

petition was remanded to New York Supreme Court for findings of fact regarding the lone surviving claim that Selvin Spencer committed perjury when he testified against petitioner at trial. While the case was pending, Selvin Spencer died before he could testify. Prior to his death, Spencer had signed several affidavits purportedly recanting his testimony at trial, although the affidavits were often preceded by letters from Spencer to the District Attorney's Office indicating that individuals had coerced him into signing the affidavits by threat of violence. At the hearing, both Johnson and the District Attorney called multiple witnesses. Specifically, Johnson's witness Victor Berry testified that Selvin Spencer had told Berry that "he never seen what went down," and that Spencer was "getting high" at the time of the shootings. (Dec. 15, 2004 Hrg. Tr. 22-23.) Arthur Brodie testified that he had witnessed the shootings in 1986, and he identified the shooters as two individuals by the name of Ron-K and Magnetic, not Johnson. (Jan. 19, 2005 Hrg. Tr. 8-9.) By the time of the hearing, Ron-K (whose real name was Rodney Pender) had been deceased.

Later, Denise Williams, who claimed to be a close friend of Pender, testified that he had confided in her sometime in 1986 that he and another individual named Magnetic had committed the murders of Gonzalez and Rogers. (*Id.* at 60-61.) Alvin McKoy, who testified at the hearing by video conference due to his incarceration in North Carolina, indicated that he and Selvin Spencer, who McKoy knew by his street name of Raheem, were using heroin on the night of the shootings and that Spencer did not witness the shootings. (Apr. 6, 2006 Hrg. Tr. 14, 17-18, 24.) Johnson also called Detective Stephen Chmil, who testified regarding the investigation of the murders of Gonzalez and Rogers. (June 21, 2006 Hrg. Tr.) According to Chmil, very shortly after the murders, the "word on the street" was that "Umagisty" (Johnson) and "Natural" (Michael Sennon) had committed the murders. (*Id.* at 13-14.)

The District Attorney called Brian Harnick, who was the Assistant District Attorney ("ADA") who prosecuted Johnson. He testified about the pretrial preparations, including an interview he conducted with Selvin Spencer, as well as the trial. (Sept. 19, 2006 Hrg. Tr.) Michael Cavuto, another police officer, testified about the investigation. (Oct. 19, 2006 Hrg. Tr.) John O'Mara, another Assistant District Attorney, testified that he fielded letters from Selvin Spencer after Harnick had left the District Attorney's office. (Nov. 9, 2006 Hrg. Tr. 38-40.) According to O'Mara, Spencer indicated in his letters that he had been threatened and assaulted because he testified against Johnson, and that inmates had coerced Spencer into signing affidavits recanting his testimony at trial. (*Id.*) Moreover, Vernon Fonda, an employee of the New York State Department of Correctional Services, testified that as a result of his letters, Spencer was placed into protective custody. (*Id.* at 76.)

Johnson called two rebuttal witnesses. First, he called John Parron, who was the CEO of See-Clear Janitorial Services, to testify about business practices at the company in 1986. A note in Detective Cavuto's investigation notebook indicated that Michael Sennon, who was initially a suspect along with Johnson, and who was identified by Selvin Spencer as the second shooter, worked at See-Clear Janitorial Services. According to the note, Sennon was working at a Brooklyn IBM facility pursuant to a contract with See-Clear on the night of the murders. Johnson called Parron to corroborate Sennon's alibi, discredit Spencer's identification of Sennon as the second shooter, and thereby establish that Spencer did not witness the shooting. Parron testified that he did not know Sennon and that employment records from 1986 were no longer available. He testified, however, that contractors often prohibited employees from leaving the facility for meals when they were on duty. (Nov. 9, 2006 Hrg. Tr. 10-11.) Parron said that he did not know whether the policy was in place in 1986. (*Id.* at 11.)

5

Finally, Johnson called Eric McKenzie, who lived in the Bedford Stuyvesant area in 1986. He testified about an incident that occurred on June 16, 1986, several days before the murders of Gonzalez and Rogers. According to McKenzie, he had been standing on the street with Johnson and Michael Sennon, when Rodney Pender and "Magnetic" arrived. (Dec. 18, 2006 Hrg. Tr. 21-23.) McKenzie testified that Johnson and Pender began arguing, and then somebody shot McKenzie from behind. (*Id.*) McKenzie believed that the shooter was Magnetic. (*Id.* at 26.) McKenzie also believed that the person who killed Gonzalez and Rogers was the same person who shot McKenzie. (*Id.* at 25.) McKenzie also testified that several years later, in either 1993 or 1994 (*id.* at 28) (or perhaps 1987) (*id.* at 48-49), when he was incarcerated at Rikers Island, he met Selvin Spencer in the law library. According to McKenzie, Spencer told him that he had "messed up because he lied on Majesty about something." (*Id.* at 28.) Immediately afterwards, Johnson came down and met Spencer and McKenzie in the library. According to McKenzie, Spencer apologized to Johnson and promised to "make it right." (*Id.* at 29.) McKenzie said that Johnson did not threaten Spencer at that time. (*Id.*)

After the hearing, Justice Lewis issued an opinion finding that the District Attorney had not knowingly utilized perjured testimony at Johnson's trial. Specifically, Justice Lewis found that Denise Williams, Alvin McKoy, Eric McKenzie, Arthur Brodie and Victor Berry were not credible. *People v. Johnson* ("*Johnson II*"), 859 N.Y.S.2d 897, No. 4319/86, 2008 WL 425142, at *10 (N.Y. Sup. Ct. Feb. 15, 2008). With respect to Spencer's affidavits recanting his testimony, Justice Lewis held that "[t]he recantations by Mr. Spencer, now deceased, are not uniform, give an account of the shootings inconsistent with established facts asserted by all other witnesses, and are preceded by letters that speak to their inducement by threats." *Id.* Consequently, the court found that Johnson had not "established that any perjured testimony was

utilized in the course of Mr. Johnson's trial, much less that the prosecution knew or should have known of any such occurrence." *Id.* at *12.

## DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to both of Johnson's habeas claims, to prevail on a petition for a writ of habeas corpus, a petitioner confined pursuant to a state court judgment must show that the court's "adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). An "unreasonable application" occurs when a "state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id*. Unreasonableness is determined by an objective standard. *Id.* at 409. Moreover, the Supreme Court has held that "unreasonableness" should not be conflated with "clear error" because "[t]he gloss of clear error fails to give proper deference to state courts." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The deference given to state court decisions is particularly strong in the case of factual findings. Such findings enjoy a strong presumption of correctness that may only be rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

I. **Use of Allegedly Perjured Testimony**

Johnson's first claim, which was held over due to the state-court remand, alleges that prosecutors knowingly allowed Selvin Spencer to present perjured testimony during Johnson's

trial in violation of the Due Process Clause. According to Johnson, Spencer falsely testified that he saw Johnson running down the street after the shooting because he never was in a position to view the shooters. Johnson's theory of the case is that Rodney Pender and individual known only as Magnetic committed the murders. Generally, "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment, . . . [and the] same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (internal citations omitted). Under this standard, a conviction must be set aside if newly discovered evidence shows that "(1) the prosecution knew, or should have known, of the perjury, and (2) there is any reasonable likelihood that false testimony could have affected the judgment of the jury." *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) (internal citation, quotations, and footnote omitted).

Nevertheless, as observed in my initial memorandum and order, the state of Second Circuit law on this issue was "uncertain." *Johnson I*, 2003 WL 22002420, at *5. Specifically, in a pre-AEDPA case, *Sanders v. Sullivan*, 863 F.2d 218 (2d Cir. 1988), the Second Circuit held that habeas corpus relief may be granted even in the absence of prosecutorial knowledge that perjured testimony was introduced at a petitioner's trial. Subsequently, in *Drake v. Portuondo*, the Second Circuit recognized that *Sanders* "explicitly relied on Justice Douglas' *dissent* in *Durley v. Mayo*, 351 U.S. 277 (1956)." *Drake*, 321 F.3d at 345, n.2. Consequently, because "AEDPA permits us to rely only on clearly established Supreme Court precedent," the Second Circuit held that habeas relief is warranted only where prosecutors had knowledge of the perjury. *Id.*

8

Shortly after *Drake* was decided, however, the Second Circuit, relying on *Sanders*, held that "due process is violated only if the testimony was material and the court [is left] with a firm belief that, but for the perjured testimony, the defendant would most likely not have been convicted." *Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir. 2003) (internal quotations omitted). As I previously observed, "*Ortega* cannot be reconciled either with AEDPA or *Drake v. Portuondo*." *Johnson I*, 2003 WL 22002420, at *4. Unfortunately, little has occurred since 2003 to clarify this apparent inconsistency. Some courts have attempted to explain the discrepancy, *see Ortiz v. Woods*, 463 F. Supp. 2d 380, 396 (W.D.N.Y. 2006) (attempting to reconcile *Ortega* and *Drake* by noting that *Ortega* was not decided under the deferential AEDPA review standard), while others have simply ignored *Ortega*'s holding, *see Laurey v. Graham*, 596 F. Supp. 2d 743, 766-67 (W.D.N.Y. 2008) (holding that prosecutorial knowledge is a requirement to establish due process violation and noting that *Sullivan* does not apply in an AEDPA case). Nevertheless, nothing in the state court proceedings on remand has altered my initial conclusion that "petitioner cannot prevail here," *Johnson I*, 2003 WL 22002420, at *4, because Johnson has not provided clear and convincing evidence to rebut the state court finding that perjured testimony was not introduced at Johnson's trial.

Johnson contends that Spencer's affidavits recanting his testimony at trial, which "have now been corroborated by several independent witnesses who testified at the state court hearing," (Pet'r's Mem. 42) demonstrate that prosecutors knowingly introduced Spencer's perjured testimony at Johnson's trial. The Second Circuit has instructed that a witness's recantation must be "looked upon with the utmost suspicion," *see Ortega*, 333 F.3d at 107 (quoting *Sanders*, 863 F.2d at 225), and the particular circumstances here demonstrate why such skepticism is warranted. As the Justice Lewis properly found:

9

> Subsequent to testifying at Mr. Johnson's trial and incident to subsequent State incarcerations, Mr. Spencer wrote some eighteen letters to the Kings County DA's Office which advised of threats from Mr. Johnson and his friends/associates, recanting his trial testimony as a result thereof, requested assistance in obtaining work-release, and submitting to prosecution for perjury so as not to have to watch his back. Mr. Spencer's medical records during his incarceration revealed complaints of head trauma in October 1991, dizziness, blurred vision, injury causing brief loss of consciousness, a brain scan for subdural hematoma (with negative results), and fear of sneak attacks in 1992. In one of the various recantations allegedly authored by Mr. Spencer, details were furnished that were inconsistent with the crime; eg, a blue vehicle having been exited by the victims, and reference to a parallel Avenue for their subsequent chase.

*Johnson II*, 2008 WL 425142, at *7. Moreover, as I previously observed, the first affidavit that Spencer authored purportedly recanting his trial testimony was written in October 1992. *Johnson I*, 2003 WL 22002420, at *3. However, in the prior seven months, Spencer had written seventeen letters to the District Attorney describing assaults to which he was subjected and threats that further violence would be inflicted upon him unless he recanted his testimony. One month after Spencer drafted the first affidavit, he sent another letter to the District Attorney describing the circumstances under which the affidavit was created:

> I am written you to let you know, I have been threaten and my family have been threaten. . . [Johnson] written a friend of his here, and threaten to kill my family, as well as me. The affidavit was written out already. All I had to do was sign it to keep from getting attack again as I did in Franklin Corr Facility March of this year. I was slice across my right arm with a razor twice.

*Id.*

Johnson relies primarily upon the testimony of Victor Berry, Arthur Brodie, Denise Williams, Alvin McCoy and Eric McKenzie, which Johnson claims corroborates Spencer's recantations and thus proves that his testimony at trial was false. However, Justice Lewis found that all of these witnesses were not credible based on their criminal records, inconsistencies in

their testimony and their demeanor on the stand. *Johnson II*, 2008 WL 425142, at *10. Moreover, she also found that the witnesses' associations with each other and with Johnson are "especially telling of collusion." *Id.* The presumption of correctness that applies to the state court's factual findings on AEDPA review is "particularly important when reviewing the trial court's assessment of witness credibility." *Coto v. Herbert*, 331 F.3d 217, 233 (2d Cir. 2003).

Moreover, Justice Lewis's assessment of the credibility of Johnson's witnesses is well-supported by the record, and Johnson has not rebutted the finding with any clear and convincing evidence. Indeed, Berry has been convicted of two felonies, including a conviction for armed robbery for which he was sentenced to nine to eighteen years of imprisonment. (Dec. 15, 2004 Hrg. Tr. 13.) He testified that he and Johnson "would hang out, I showed him love, he showed me love things of that nature." (*Id.* at 16.) Arthur Brodie is currently incarcerated for a murder that he committed in 1987. (Jan. 19, 2005 Hrg. Tr. 4.) In the courtroom when the verdict in that case was announced, Brodie and his co-defendants Robert Brodie and Michael Sennon (the same individual that was a suspect in this case) had concealed two razors and a "shiv" on their persons. The Brodies threw tables and chairs at the court clerk and threatened court personnel with the razors and shiv. (*Id.* at 30.) Brodie pled guilty to attempted assault on a court office related to this incident. (*Id.* at 33.) He testified that he has known the defendant and his family "basically all [his] life," although he testified that they were neither friends nor enemies. (*Id.* at 15.) Brodie also knew Berry because they grew up in the same neighborhood and were both incarcerated together, during which time both Brodie and Berry drafted affidavits in this case. (*Id.* at 47.) As the state court found, the fact that Brodie was willing to "come forward" when he had testified that his "normal inclination[ was] not to cooperate with the system (police, etc.) is especially telling of collusion." *Johnson II*, 2008 WL 425142, at *10.

Denise Williams, another of Johnson's witnesses, visited Brodie in prison numerous times and misrepresented her employment and educational history during the hearing. *Id.* at *5. She also testified that she was friends with the petitioner and had visited him jail. (Jan. 19, 2005 Hrg. Tr. 62-63.) Moreover, although she testified that Rodney Pender was "like a brother to [her]," (*id.* at 67) she could not identify where he lived and did not know his birthday (*id.* at 71-72). Alvin McCoy had a litany of criminal convictions, so many so that when asked how many times he had been convicted, he stated, "I can't really count." (Apr. 6, 2006 Hrg. Tr. at 7.) McCoy's willingness to submit an affidavit and testify came only after he was contacted by Brodie. (*Id.* at 40-42.) Indeed, although McCoy testified that he was using drugs with Raheem on the night of the murders, he did not know that "Raheem's" real name was Selvin Spencer until Brodie told him so. (*Id.* at 42-43.) Finally, Eric McKenzie is currently incarcerated in Attica Correctional Facility on a weapons possession conviction as a persistent violent felony offender. (Dec. 18, 2006 Hrg. Tr. 17, 30.) McKenzie testified that he and Johnson were "cool," (*id.* at 38) and that they had been incarcerated together for eight to nine months (*id.* at 52). Moreover, as the state court found, "never before the hearing had [McKenzie] accused Magnetic of having shot him." *Johnson II*, 2008 WL 425142, at *12. Indeed, McKenzie's testimony that he had been shot by Magnetic, and that the same person who shot him also shot Gonzalez and Rogers, is directly refuted by Detective Savarese, who was assigned to the McKenzie shooting. He testified that when he spoke to McKenzie immediately after the shooting occurred, McKenzie indicated:

> that he was on DeKalb doing some dust, angel dust, and he was approached by Natural Brother and Your Majesty . . . They all went around the corner, and he was speaking to Natural Brother, and he said Your Majesty was off to his side. He said that he met Natural Brother on Rikers Island. During the conversation, he heard a bang, and he fell to the floor. When he was on the floor,

> he stated that Your Majesty was removing his gold. He stated that him and Your Majesty got each other's gold after he got out of Rikers Island. And he said that he had a beef with Your Majesty, but that Natural Brother straightened it out.

(Nov. 9, 2006 Hrg. Tr. 21.) According to Savarese, McKenzie selected Sennon and Johnson's photographs out of an array, and McKenzie did not mention Magnetic when he was interviewed. (*Id.* at 25.)

Johnson also argues that Spencer's account of the events surrounding the shootings is inconsistent with other trial witnesses' accounts. The relevant portion of Spencer's trial testimony is as follows:[1]

> Q: And the second victim ran to Sumner and made a turn on Sumner?
>
> A: Right, ran around the corner.
>
> Q: To Sumner and went towards Park or towards Vernon?
>
> \* \* \*
>
> A: Towards Vernon. It had to be going toward Vernon when he made that turn. The park is going the other way.
>
> Q: The second person, when he was running, going down Sumner, where was the defendant?
>
> A: The defendant was chasing him.
>
> Q: Was that before or after the first victim was shot?
>
> A: That was after, after.
>
> Q: And where was the other person with the gun besides the defendant, where was he?
>
> A: He was running, too.
>
> Q: In what direction?
>
> A: Okay. One was down by Sumner Avenue on the corner, and the other one ran around Myrtle, going toward Vernon, around that corner.

---

[1] The excerpt of Spencer's testimony that is reproduced in Johnson's memorandum of law is both incomplete and inaccurate. (*See* Pet'r's Mem. 44.) The portion cited here both fixes Johnson's inaccuracies and places the testimony in the proper context.

13

> Q: You mean – when you say "one," you're talking about the shooters?
>
> A: Right.
>
> Q: So they went in opposite directions?
>
> A: Right
>
> Q: And which direction did the defendant go in?
>
> A: Okay – after which?
>
> Q: After he shot the first person, what direction did the defendant go?
>
> A: He went towards Vernon.
>
> Q: Did he go toward Sumner or towards Throop?
>
> A: He went towards Throop.
>
> Q: And when he was running by, what part of him were you able to see?
>
> A: I was able to see, you know, like the side of his face, you know, almost the front, you know.

(Trial Tr. 339-40.) According to Johnson, Spencer testified that after the first victim (Gonzalez) was shot on Myrtle Avenue, Johnson chased the second victim (Rogers) down Myrtle Avenue in a westerly direction toward Throop, turned left, headed south on Throop toward Vernon Avenue—which is one block south of Myrtle—then turned left again on Vernon Avenue, where he was shot by Johnson. Johnson argues that "Spencer's trial account was the only one to have the shooters chase Rogers along Myrtle to Throop and then to Vernon." (Pet'r's Mem. 45.) Johnson also points to Detective Cavuto's testimony at the hearing that Spencer's "account was contrary to the observations of every other eyewitness." (*Id*. at 44.) Nevertheless, it is not clear whether Spencer meant that Johnson "went toward Throop" after the first shooting when Johnson was on Myrtle Avenue—which would not be consistent with Detective Cavuto's account—or when Johnson was on Vernon Avenue—which would be consistent. Indeed, in other parts of his testimony, Spencer stated that when the second victim (Rogers) was being chased on Myrtle Avenue, he ran in an easterly direction toward Sumner. (Trial Tr. 338.)

14

Moreover, even assuming that the cited portion of Spencer's testimony was inaccurate, this discrepancy is hardly sufficient to satisfy by clear and convincing evidence Johnson's burden to prove that Spencer committed perjury. At most, it proves that Spencer was mistaken about a minor portion of his testimony, or that he was confused by the repetitive questioning of the prosecutor. Finally, to the extent that Spencer's account was inconsistent with other witnesses, the inconsistency would have been evident to the jury at trial. Notwithstanding, the jury convicted Johnson on both charges.

Johnson also argues that the prosecutors knew that Spencer suborned perjury because Spencer identified Michael Sennon as the second shooter to the police. According to Johnson, Sennon was working for See Clear Maintenance at an IBM facility on the night of the shooting. Johnson argues that John Parron corroborates Sennon's testimony, and that "[c]learly, Sennon was not arrested because his alibi was verified." (Pet'r's Mem. 46.) Johnson, however, overstates the value of Parron's testimony. Parron testified on direct that he did not recall Michael Sennon and that the employment records of See Clear Maintenance from 1986 were not available. (Nov. 9, 2006 Hrg. Tr. 11.) Consequently, Parron could not corroborate Sennon's alibi for the night of the murder. Indeed, the only evidence that Sennon was working on the night of the murder was his own self-serving statement as captured in Detective Cavuto's case notes. (Oct. 19, 2006 Hrg. Tr. 109-11.)

Johnson also argues that Detective Chmil's testimony regarding his interview with Marvin Lamar corroborates Spencer's recantations. Specifically, according to Johnson, Detective Cavuto's notes of the interview indicate that the second victim, Damian Rogers, yelled out shortly before he was shot, "I am sorry M-A-G, I am sorry, please don't shoot." (June 21, 2006 Hrg. Tr. 90.) Detective Chmil, who was shown the notes, testified that "Mag" was spelled

15

out as M-A-G, which Johnson argues corroborates his theory that Magnetic, and not Johnson/Majesty, was the shooter. Chmil, however, had no independent recollection of the interview with Marvin Lamar, and did not recall whether Lamar had witnessed Rogers yell "I am sorry Mag," or "I am sorry Maj." (*Id.* at 91.) Detective Cavuto, whose notes were shown to Detective Chmil on the stand, was asked on the stand about the interview with Lamar. Cavuto stated that Lamar had indicated that the victim yelled "I'm sorry Maj." (Oct. 19, 2006 Hrg. Tr. 24; Ashby Affidavit ¶ 5.) Brian Harnick, the prosecutor who handled the Johnson case, also recalled speaking to Lamar in preparation for trial. He testified that Lamar told him that he had heard the victim state "I'm sorry Maj." (Sept. 19, 2006 Hrg. Tr. 22.) Indeed, Harnick testified that the name "Maj" was "noteworthy at the time," because it was his understanding that Johnson's street name was "U Magisty or Magisty." (*Id.* at 23.) Harnick's recollection of this testimony was very specific because his attempt to elicit testimony from Lamar about Rogers' final declaration was rejected by the trial judge. Harnick testified that "[t]here were some components of this case that I will never forget . . . [and] the nickname issue is something that stuck with me forever." (*Id.*)

Johnson argues that the fact that a .32 caliber shell was found in the car that Gonzalez and Rogers were driving is evidence that the shooting occurred inside the car, not after the victims had exited the car, as Spencer testified. The ballistics report that forms the basis of this argument is also the piece of evidence alleged to have been withheld by prosecutors in violation of their *Brady* obligations. However, as Detective Savarese testified, spent shell casings from semiautomatic weapons can be ejected one to five feet away from the gun when it is fired. (Nov. 9, 2006 Hrg. Tr. 26-27.) Consequently, the fact that a shell casing was found inside the car is nonetheless not inconsistent with Spencer's testimony.

Finally, Johnson ignores other evidence that corroborates Spencer's trial testimony and refutes his subsequent affidavits. Specifically, Marvin Lamar's account of the shooting at trial, his testimony before the grand jury, and his selection of Johnson's image from a photographic array all corroborate Spencer's testimony. *See Richardson v. Superintendent of Mid-Orange Corr. Facility*, No. 09-3655-pr, 2010 WL 3619781, at *7 (2d Cir. Sept. 20, 2010); *Brisco v. Ercole*, 565 F.3d 80, 95 (2d Cir. 2009) (Cabranes, *J*.); *id* at 99 (Korman, *J*., concurring). Moreover, Spencer's testimony is also corroborated by other witnesses to the shooting that did not testify. For instance, as Detective Chmil testified during the proceedings on remand, he interviewed 46-year-old Aretha Farrow, a resident of the neighborhood, whose account of the shooting was consistent with Spencer's testimony. (June 21, 2006 Hrg. Tr. 70-72.) Johnson also ignores the testimony of Brian Harnick, the ADA who tried the case, and who denied that Spencer committed perjury on the stand. Harnick indicated that during the cross examination of Spencer, the defense counsel asked several questions about the vehicle that was relevant to the case. Spencer volunteered "that it was a livery plate which was part of his motivation for what he expressed as to why he thought something was happening at the time." (Sept. 19, 2006 Hrg. Tr. 55.) According to Harnick, Spencer "testified there was a slow moving car, and he testified that it had livery plates which was three or so in the morning, was not normal type of behavior." (*Id.*) Harnick stated that when the police seized the vehicle, the voucher indicated that it had a livery plate, which Harnick testified "is just an independently small piece of fact that is consistent with someone being there and seeing it as opposed to not being there." (*Id*. at 55-56.) Harnick also testified that Spencer's testimony was consistent with the findings of the medical examiner. Specifically, Harnick stated that "the entry wounds on the body was consistent with the way Mr. Spencer described the position of the people during the incident." (*Id.* at 123.)

In sum, Johnson has not presented any clear and convincing evidence that would rebut the presumption of correctness that attaches to the state court's finding that no perjured testimony was introduced at his trial.

## II. *Brady* Claim

Johnson's second claim, which was rejected by the state court as part of his CPL § 440.10 petition, *Johnson II*, 2008 WL 425142, at *12, alleges that prosecutors failed to produce a ballistics report indicating that the .32 caliber shell casing found inside the vehicle driven by Gonzalez and Rogers was linked to the .32 caliber shell found near the scene of Eric McKenzie's shooting in June 1986. Johnson argues that the report is significant because it links the shooting of McKenzie to the murders of Gonzalez and Rogers, and, according to McKenzie, Magnetic perpetrated the former shooting. In order to sustain a due process claim under *Brady v. Maryland*, a habeas petitioner must show: (1) the evidence at issue is favorable to the petitioner, either because it is exculpatory or it is impeaching; (2) the evidence was suppressed by the prosecution, willfully or inadvertently; and (3) prejudice. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). To satisfy the prejudice requirement, a petitioner must show a "reasonable probability of a different result" had the material been timely disclosed. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotations omitted).

All parties agree that the ballistics report was not disclosed to Johnson until after I remanded the case to the New York Supreme Court. Johnson's claim fails, however, because as discussed previously, Justice Lewis found that McKenzie's testimony was not credible. Indeed, she found that "never before the hearing had [McKenzie] accused Magnetic of having shot him," *Johnson II*, 2008 WL 425142, at *12, and McKenzie did not testify at Johnson's trial. Moreover, McKenzie's claim that Magnetic was the shooter is contradicted by Detective Savarese, who

interviewed McKenzie at the time of his shooting and testified that McKenzie did not identify Magnetic as his shooter at that time. Indeed, McKenzie conceded that he did not tell Savarese or other law enforcement officers that Magnetic was the person who shot him. (Dec. 18, 2006 Hrg. Tr. 35.) Under these circumstances, Justice Lewis's decision to deny the *Brady* claim did not constitute an unreasonable application of federal law.

Moreover, to the extent that Johnson repeats the allegations made in his earlier petition, that the shell casing proves that the shooting occurred inside the vehicle, this argument was rejected in my initial opinion rejecting the claim. Briefly, it was clear from a property voucher that was disclosed to defense counsel that "all parties were aware that another bullet shell was found inside the victims' car, even though the murders occurred outside the car." *Johnson I*, 2003 WL 22002420, at *5. Defense counsel was given the opportunity to inspect the vehicle prior to its release to its owner. Johnson agrees that the fact that a spent shell casing was disclosed prior to trial. He argues, however, that the disclosure was "inconsequential since it could have come from weapons owned by Rogers and/or Gonzalez." (Pet'r's Mem. 57.) Johnson contends that this new ballistics report establishes that the "shell found inside the burgundy car came from a gun used by one of the shooters," who "must have been so close to the maroon car that a discharged shell fell inside it." (*Id*. at 57-58.) Nevertheless, it does not appear that the District Attorney argued in the prior proceeding that the shell casing came from weapons owned by Gonzalez or Rogers, nor does that serve as a basis of my dismissal of Johnson's previous *Brady* claim. Indeed, all parties appeared to be operating under the assumption that the shell casing came from the weapon of one of the shooters. Nevertheless, I dismissed Johnson's *Brady* claim on the merits, and this new report does not alter that conclusion. Finally, Johnson's theory that the shootings occurred inside or immediately adjacent to the vehicle is simply

19

implausible, given the "unquestionable documentary proof and numerous witnesses who, even though they were reluctant or refused to identify petitioner as the shooter, testified that they observed the shootings occur outside the vehicle. Indeed, the two bodies were found some distance from the vehicle." *Johnson I*, 2003 WL 22002420, at *6.

## CONCLUSION

The petition is denied.

SO ORDERED.

Brooklyn, New York
October 1, 2010

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge